UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

GINA PHILOMENA CROCCO,

                             Plaintiff,

                   v.

NANCY A. BERRYHILL[1]
*Acting Commissioner, Social Security
Administration*,

                             Defendant.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-6308 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff Gina Philomena Crocco filed the above-captioned action pursuant to 42 U.S.C.

§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for supplemental security income and social security

disability benefits under the Social Security Act (the "SSA").  Plaintiff moves for judgment on

the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that

Administrative Law Judge James Kearns (the "ALJ") erred by (1) improperly weighing the

evidence, (2) improperly assessing Plaintiff's residual functioning capacity ("RFC") and (3)

improperly assessing Plaintiff's credibility.  (Pl. Mot. for J. on the Pleadings, Docket Entry No.

9; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem.") 8, 14, Docket Entry No. 10.)  The Commissioner

cross-moves for judgment on the pleadings, arguing that the ALJ's decision is supported by

---

[1]  Pursuant to Fed. R. Civ. P. 25(d), the caption has been updated to reflect the new
Acting Commissioner of Social Security, Nancy A. Berryhill, who took office on January 23,
2017.

substantial evidence and should be affirmed.  (Comm'r Cross-Mot. for J. on the Pleadings, Docket Entry No. 12; Comm'r Mem. in Opp'n to Pl. Mot. and in Supp. of Def. Cross-Mot. ("Comm'r Mem.") 18, 24, Docket Entry No. 13.)  For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted, the Commissioner's cross-motion for judgment on the pleadings is denied, and the case is remanded for further proceedings consistent with this Memorandum and Order.

## I.  Background

Plaintiff was born in 1967.  (Certified Admin. Record ("R.") 183, Docket Entry No. 8.) Plaintiff has an eleventh-grade education.  (R. 34.)  She was previously employed as a direct care worker for mentally disabled adults and temporarily as a waitress.  (R. 35, 49.)  On August 3, 2012, Plaintiff applied for social security disability benefits, stating she was disabled as of December 1, 2006, due to major depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder ("OCD") and panic disorder with phobic features.  (R. 104, 183, 227.) Plaintiff's application was denied after initial review, and she requested a hearing before the ALJ.  (R. 127–28.)  On March 11, 2014, Plaintiff submitted a supplemental security income application and requested that the application be merged with the pending social security disability application.[2]  (R. 206–15, 277.)  In her supplemental security income application, Plaintiff identified her conditions as "back, leg and depression."[3]  (R. 208.)  Plaintiff appeared

---

[2]  It appears that, before the March 11, 2014 supplemental security income application, Plaintiff may have filed a separate supplemental security income application with her social security disability application on August 3, 2012.  (R. 187–97.)  The Court does not have any information as to why the March 11, 2014 supplemental security income application was filed.

[3]  Although the March 11, 2014 supplemental security income application was submitted only one day before the hearing and the ALJ indicated during the hearing that he was unsure whether there needed to be a preliminary decision on the application before he could rule on it,

with her attorney before the ALJ on March 12, 2014. (R. 28–54.) By decision dated June 16, 2014, the ALJ determined that Plaintiff was not disabled and denied Plaintiff's application. (R. 11–23.) On September 14, 2015, the Appeals Council denied review of the ALJ's decision. (R. 1–6.) Plaintiff commenced this action on November 4, 2015. (Compl., Docket Entry No. 1.)

### a. Plaintiff's testimony

At the March 12, 2014 administrative hearing, Plaintiff testified that she lives with her brother-in-law, but in 2011 she lived alone. (R. 33, 39.) Plaintiff's son and other family members help her when she needs to leave the house. (R. 33.) Public transportation makes her nervous but she has a driver's license and is able to drive if necessary. (R. 33, 47.) Plaintiff completed school through the eleventh grade. (R. 34.) Plaintiff regularly worked as a direct care worker for mentally disabled adults until 2006. (R. 35.) She was not able to continue that work because she hurt her back while working. (R. 36.) Plaintiff received workers compensation for a "couple [of] years." (R. 36.) Plaintiff has not worked since 2006 but attempted to waitress approximately one year prior to the administrative hearing. (R. 34.) Plaintiff's waitressing shift was from 9:00 PM to 7:00 AM five days a week. (R. 34–35.) Plaintiff discontinued the work after less than one month because her legs would "give out" and she struggled to remember things. (R. 34–35.)

Plaintiff has not felt well since 2006. (R. 36.) Her back and leg constantly bother her and she suffers from depression and anxiety. (R. 36.) Plaintiff's neck pain is becoming worse, her leg is always numb, she suffers from short-term memory loss and panic attacks, and the left side of her body bothers her. (R. 44, 47.) Plaintiff received lower back pain injections that

---

(R. 30–31), his decision appears to dismiss both Plaintiff's supplemental security income and social security disability applications. (R. 14 ("Claim For: Period of Disability, Disability Insurance Benefits, and Supplemental Security Income").)

helped with the pain for a few days at a time and also received an epidural injection. (R. 44–45.) Plaintiff feels anxious daily and has a low energy level. (R. 45–46.) Plaintiff received treatment from Eric Peselow, M.D., but ceased her regular psychiatric care after she lost insurance coverage approximately two years before the administrative hearing. (R. 36–37.) Plaintiff has since reobtained "health coverage." (R. 37.) Plaintiff stopped taking her psychiatric medications after she discontinued visits with Dr. Peselow; she found the medications helpful but one of them caused her to suffer migraines. (R. 37–38.)

Plaintiff takes Percocet to manage her pain, Propranolol for high blood pressure and to prevent migraines, Ambien to help with sleep, and Sumatriptan with a combination of Naproxen to alleviate migraines. (R. 37–38.) In response to a question from the ALJ as to whether Plaintiff previously had an addiction to Percocet, Plaintiff responded, "I didn't have addiction with that. I was trying to get better. I didn't want to really rely on it, but I need it." (R. 38.)

Plaintiff is capable of making herself a sandwich but her brother-in-law regularly cooks for her, she can clean but takes breaks to sit or lie down, and her son helps her with her laundry. (R. 39–40, 42.) She does not shop for her own groceries because she has to take breaks when her knee begins to bother her and because she becomes anxious in the store. (R. 46–47.) Plaintiff's leg causes her pain when she walks, even for short distances, and sometimes when she stands. (R. 41.) Plaintiff can sit for approximately a half-hour before her leg will become numb and she becomes anxious and needs to stand up. (R. 40.) Plaintiff lies down often during the day to alleviate the pain from the pinched nerve on her left side. (R. 43.) She can lift between seven and ten pounds and is able to lift her seven-pound dog. (R. 41.)

### b. Vocational expert testimony

Raymond Cestar, vocational expert, testified that Plaintiff's past work as a direct care

worker was medium work with a specific vocational preparation ("SVP") of six. (R. 48–49.) He testified that a hypothetical person with sedentary restrictions could not perform the job of a direct care worker. (R. 49.) However, Cestar testified that the same hypothetical person with direct care work experience, though limited to sedentary work, could perform unskilled work as a clerical worker, account clerk or order clerk. (R. 49–50.) He testified that no jobs would be available to the same hypothetical individual if they either (1) required "unscheduled breaks of an hour per day in addition to normal breaks," (2) required absence from work more than three times per month, (3) required daily breaks to lie down for an hour during the day in addition to scheduled breaks, or (4) would not be able to sustain eight hours of sitting, standing and walking. (R. 50–52.)

### c.  Medical evidence

#### i.  Dr. Kevin Weiner

##### 1.  Treatment notes

Dr. Weiner has been treating Plaintiff since February 3, 2004.[4] (R. 491.) On August 19, 2006, prior to her alleged onset date, magnetic resonance imaging ("MRI") showed Plaintiff had L4-5 annular fissure (disc herniation). (R. 469, 472, 478.) Imaging of Plaintiff's cervical spine and lumbar on September 26, 2006 showed "straightening and slight reversal of the normal

---

[4]  The record also includes findings from Dr. Weiner prior to Plaintiff's alleged disability onset. Dr. Weiner's impressions from Plaintiff's first visit were: (1) "cervical sprain vs. cervical disc herniation," (2) "post-concussive disorder" and (3) "lumbar sprain vs. lumbar disc herniation." (R. 492.) Plaintiff had regular follow up visits with Dr. Weiner, who prescribed her Percocet to manage her continued back and neck pain and oversaw a course of treatment including, among other things, physical therapy and trigger point injections for approximately three years leading up to the onset of Plaintiff's disability on December 1, 2006. (R. 470, 475–77, 480–92, 555.) On March 21, 2006, Dr. Weiner noted "cervical radiculopathy needs to be ruled out." (R. 475.) On July 13, 2006, Dr. Weiner noted Plaintiff's "history of disc herniations and stenosis" and recommended that Plaintiff obtain a repeat MRI and EMG to determine whether her "lipoma was causing proliferal nerve versus lumbar radiculopathy." (R. 470.)

cervical lordosis suggesting spasm" and normal "lumbar vertebral bodies and intervertebral disc spaces," respectively. (R. 473.) Plaintiff's first visit with Dr. Weiner after her onset date was on March 20, 2007. (R. 466.) Plaintiff complained of back pain but noted that Percocet "helps to alleviate the pain." (R. 466.) Dr. Weiner diagnosed Plaintiff with "a large L4-5 disc herniation," indicated Plaintiff was going to begin physical therapy and noted that she was awaiting authorization for epidural injections. (R. 466.) Dr. Weiner opined that Plaintiff "is totally disabled and unable to return to work." (R. 466.) Plaintiff had subsequent visits with Dr. Weiner that summer and continued to complain of back pain and indicated the physical therapy made her "feel[] worse" but she continued to take Percocet to manage the pain.[5] (R. 467, 471.)

On October 5, 2009, Plaintiff received an epidural injection and the next day "her leg [felt] lighter than normal." (R. 464.) On November 3, 2009, Plaintiff had a follow up appointment with Dr. Weiner, and she indicated that the epidural injection provided one month of relief and she continued to have "severe back pain radiating down the left leg." (R. 462.) Dr. Weiner indicated Plaintiff "has difficulty with activities secondary to pain." (R. 462.) Dr. Weiner noted that a second epidural injection would be scheduled and also discussed changing Plaintiff from Percocet to "a long-acting medication." (R. 462.)

On December 1, 2009, Plaintiff described "numbness and pain radiating down the left leg" that was "becoming worse" and measured the pain as a nine on a scale of one to ten. (R. 461.) Plaintiff was struggling with ambulation and Dr. Weiner noted that Plaintiff "is becoming extremely depressed from the pain." (R. 461.) Dr. Weiner opined that Plaintiff "is

---

[5] Dr. Weiner indicated after Plaintiff's June 12, 2007 and July 10, 2007 examinations that Plaintiff was awaiting authorization for epidural injections. (R. 467, 471.) At the July examination, Dr. Weiner discussed the use of oral steroids and Plaintiff indicated that they had offered her "minimal relief" in the past. (R. 471.)

totally disabled and unable to return to work." (R. 461.) Dr. Weiner recommended that Plaintiff begin physical therapy to reduce pain and inflammation, increase range of motion and improve strength to "maximize functions." (R. 461.) At Plaintiff's December 22, 2009 and January 28, 2010 evaluations, Plaintiff continued to complain of pain and at the December 22 evaluation, Dr. Weiner indicated "tenderness to palpation along the left sciatic notch" and "triggers palpating along the gluteus minimus and maximus."[6] (R. 459–60.)

On February 25, 2010, Dr. Weiner noted Plaintiff "has difficulty with activities secondary to pain," limited lumbar spine range of motion, and that Plaintiff continued to complain of "severe pain." (R. 458.) Dr. Weiner noted "tenderness to palpation along the left sciatic notch and triggers palpating along the gluteus minimus and maximus." (R. 458.) On March 23, 2010, Plaintiff was scheduled for a second epidural injection several days after the appointment with Dr. Weiner and he indicated that if the symptoms continued after the injection, Plaintiff would be "sent to a neurosurgeon for evaluation."[7] (R. 457.) Between April and December of 2010, Plaintiff continued to complain of pain, and Dr. Weiner noted tenderness to palpation along her back and knee, knee pain, limited range of motion in the lumbar spine and

---

[6] Plaintiff cancelled her second epidural injection in December of 2009 and January of 2010 because of the death of her grandmother and hospitalization for an infection, respectively. (R. 459–60.) Dr. Weiner indicated the injection would be rescheduled. (R. 458–60.)

[7] Plaintiff was wearing a knee brace when she met with Dr. Weiner and complained of difficulty with ambulation and pain in her left knee. (R. 456.) Plaintiff reported that her knee would "pop" and she felt as though her knee was "buckling." (R. 456.) Dr. Weiner ordered an MRI for Plaintiff's left knee, which occurred on April 8, 2010 and which indicated a "small suprapatellar synovial effusion" but fully intact ligaments. (R. 456, 465.) The imagery doctor, Richard DeNise, M.D., noted his impression of "minimal synovitis, myxoid degeneration of the posterior horn of the media meniscus, no evidence of posterior horn of the medial meniscus" or "definite fracture, dislocation or other derangement otherwise." (R. 465.)

difficulty with daily activities during her regular visits.[8]  Dr. Weiner scheduled several epidural injections during that time, and Plaintiff repeatedly postponed the injections.  (R. 454, 447–49.)

Dr. Weiner's evaluations of Plaintiff between January and June of 2011 indicated that Plaintiff "is unable to have epidural injections at this time," had "tenderness to palpation along the quadratus lumborum,"a "positive McMurray's sign," had "tenderness to palpation along the medial and lateral joint line of the knee," and "tenderness to palpation along the left sciatic notch and triggers palpation along the gluteus minimus and maximus."  (R. 442–46.)  Plaintiff complained of numbness in her left foot and "difficulty with activities."  (R. 445–46.)  Dr. Weiner recommended physical therapy at Plaintiff's February and April evaluations.  (R. 444–45.)

On July 5, 2011, Plaintiff received left sciatic nerve block and trigger point injections into the gluteus minimus, maximus and quadratus lumborum.  (R. 441.)  At that time, Plaintiff wanted to avoid the epidural injections.  (R. 441.)  Dr. Weiner indicated that, between August and December of 2011, Plaintiff continued to complain of back and knee pain but was "going to an OCD clinic" and "has been taking new medication."  (R. 440.)  Dr. Weiner advised Plaintiff to obtain a back brace, and he offered Plaintiff an epidural injection but she indicated she wanted

---

[8]  In June and July of 2010, Plaintiff twice postponed her epidural injections and continued to complain of pain in her back and left leg.  (R. 452–53.)  On August 10, 2010, Plaintiff's lumbar spine range of motion was limited in the "flexion: 60/90" and Plaintiff had "tenderness to palpation along the left sciatic notch and triggers palpating along the gluteus minimus and maximus."  (R. 451.)  Approximately one month later, on September 9, 2010, Dr. Weiner had similar impressions, adding that Plaintiff had "[w]eakness" in the "extensor halluces longus" and Plaintiff was scheduled for an epidural injection and to begin a "new course" of physical therapy that might not cause the pain Plaintiff previously experienced with physical therapy.  (R. 450.)  On November 4, 2010, Dr. Weiner noted Plaintiff's lumbar spine range of motion was limited in the "flexion: 65/90" and Plaintiff had "tenderness to palpation along the left sciatic notch."  (R. 448.)  Dr. Weiner scheduled epidural injections in November and December of 2010, but Plaintiff did not have the injections.  (R. 447–49.)

to "avoid the procedure." (R. 436–40.)

On January 17, 2012, Dr. Weiner recommended a review of Plaintiff's MRI results to determine if she required a new MRI of the lumbar spine. (R. 435.) Plaintiff and Dr. Weiner continued to discuss trigger point and epidural injections over the next four visits in February, April, May and June of 2012.[9] (R. 431–34.) On July 3, 2012, Plaintiff complained of pain measuring eight on a scale of one to ten, and Dr. Weiner ordered another MRI of her lumbar spine and noted Plaintiff would follow-up with a neurosurgeon and consider surgical intervention. (R. 430.) Dr. Weiner and Plaintiff discussed the possibility of surgery at her July 30, 2012 visit, but Plaintiff wanted to avoid any surgical procedure. (R. 429.) On August 30, 2012, Plaintiff's lumbar spine range of motion was limited in the "flexion: 55/90," tenderness to palpation along the left sacroiliac joint and triggers palpating along the gluteus minimus and maximus. (R. 428.) On October 25, 2012, Plaintiff received trigger point injections and Dr. Weiner reported that her range of motion was limited in the lumbar spine and also reported "tenderness to palpation along the facets at L4-5, L5-S1" and "triggers palpating along the quadratus lumborum." (R. 426.)

Plaintiff again saw Dr. Weiner in January, March and April of 2013 and they discussed surgery options. (R. 423.) Plaintiff continued to complain of pain, and Dr. Weiner indicated she "needs surgery." (R. 423–25.) On May 7, 2013 and June 4, 2013, Plaintiff told Dr. Weiner that she was caring for her ill brother and "doing a lot of bending and lifting." (R. 421–22.) At her June 4, 2013 appointment, Dr. Weiner noted a limited range of motion in the lumbar spine,

_____

[9] Plaintiff wanted to avoid the injections and continued to complain of pain, which she reported on April 10, 2012 was a ten on a scale of one to ten. (R. 433.)

"severe pain along the right leg with numbness" and "weakness in the anterior tibia and extensor halluces longus."[10]  (R. 421.)

On July 2, 2013 and July 30, 2013, Plaintiff continued to complain of pain, but Plaintiff was without health insurance and, accordingly, could not receive her anxiety medication. (R. 419–20.)  On September 24, 2013, Plaintiff described her pain as an eight on a scale of one to ten and expressed that she was "unable to sit or stand for a long period of time due to pain." (R. 418.)  Plaintiff deferred her epidural injection because she did not have insurance.  (R. 418.) Similar discussions regarding Plaintiff's medication and epidural injections occurred at Plaintiff's October 22, 2013 and December 5, 2013 visits with Dr. Weiner, and Plaintiff remained uninsured.  (R. 415–16.)  At the December visit, Dr. Weiner reported that Plaintiff was "doing well with the pain medications."  (R. 415.)

On January 14, 2014, Plaintiff reported neck and back pain and described her back pain as a ten out of ten.  (R. 413.)  Plaintiff continued to struggle with daily activities.  (R. 413.)  Dr. Weiner reported that she was being "worked up for migraine headaches" and might require Botox.  (R. 413.)  Dr. Weiner noted limited range of motion in her cervical spine flexion of "35/45" degrees and extension of "30/45" degrees and lateral flexion of "30/45" degrees bilaterally.  (R. 413.)  Dr. Weiner also noted Plaintiff's limited range of motion in the lumbar spine "with parethesias down the left leg" and "[p]ain along the sciatic notch."  (R. 413.)  Dr. Weiner observed "tenderness to palpation along the cervical paraspinals, triggers in the upper trapezius and serratus posterior."  (R. 413.)  Dr. Weiner recommended an MRI of the cervical and lumbar spine.  (R. 413.)  In February of 2014, Plaintiff reported continued "persistent" back

---

[10]  On three occasions, in September and October of 2012 and on June 4, 2013, Dr. Weiner discussed with Plaintiff that it "is illegal to divert medications being prescribed and to doctor shop."  (R. 426–27.)

pain and was awaiting authorization for epidural injections and MRIs of her lumbar spine.
(R. 522.)

## 2. Summary Impairment Questionnaire

On April 8, 2014, Dr. Weiner completed a Summary Impairment Questionnaire form for Plaintiff. (R. 554–55.) In the form, Dr. Weiner indicated Plaintiff suffered from cervical and lumbar radiculopathy, which was based on his clinical findings that Plaintiff suffered from L4-L5 central annular fissure/disc herniation, limited range of motion cervical spine and tenderness to palpation along cervical paraspinals with a flexion of "35/45" degrees and extension of "30/45" degrees. (R. 554.) Dr. Weiner expected the conditions to last at least twelve months and described Plaintiff's symptoms as severe neck and back pain with radicular symptoms. (R. 554.) Treatment included Percocet (10/325 mg) and Ambien (125 mg) prescriptions, physical therapy and trigger point and epidural injections. (R. 554.) Dr. Weiner estimated that during the course of an eight-hour work day, Plaintiff could perform a job in a seated position for approximately two hours and that she could stand or walk for approximately two hours. (R. 555.) Dr. Weiner opined that Plaintiff should elevate her right leg to waist level every thirty to forty minutes, five times per day and could not lift or carry more than ten pounds, but she could occasionally lift five to ten pounds and frequently lift five pounds or less. (R. 555.) Dr. Weiner did not find any significant limitations in reaching, handling or fingering. (R. 555.) Dr. Weiner opined that Plaintiff would be likely to miss work more than three times a month as a result of her impairments. (R. 555.) Dr. Weiner indicated that Plaintiff had these symptoms and limitations as of December 1, 2006. (R. 555.)

### ii. Mental health and related evaluations

#### 1. FEGS evaluation

In November of 2011, Plaintiff was evaluated by FEGS Health and Human Services ("FEGS"), a social service agency. (R. 286–318.) As part of that evaluation, Plaintiff met with social worker Robin Kaynor. (R. 286.) Plaintiff explained that she was unable to work due to "medical and mental health conditions." (R. 292.) Plaintiff clarified that her barriers to employment included depression and anxiety, panic attacks, two herniated discs in her lower back, a pinched nerve in her left leg and insomnia. (R. 298.) Plaintiff was able to interact appropriately with others. (R. 299.) Plaintiff indicated that she never abused alcohol or any other substance. (R. 294.) Plaintiff's Patient Health Questionnaire (PHQ-9) score was fourteen, indicating moderate depression. (R. 296.) Plaintiff was able to wash dishes and clothes, sweep the floor, vacuum, make a bed, shop for groceries, cook meals, dress herself and bathe.[11]
(R. 298.) Plaintiff was examined by hospital physician Hun Han, M.D., who observed that Plaintiff could raise her leg thirty degrees and had "minimal difficulty" standing and walking due to the pain in her left lower back. (R. 307.) Strength in Plaintiff's left leg was "4+/5." (R. 307.) At the time of the exam, Plaintiff indicated her pain level was seven on a scale of one to ten but ranged from as low as three to as high as ten out of ten. (R. 308.) Plaintiff was anxious and exhibited poor attention during the exam. (R. 307.) Dr. Han referred Plaintiff for a Phase II psychiatric examination for her "depression OCD anxiety disorder." (R. 314.) Harvey Barash,

---

[11]  Edinam Klus, a supplemental security income case manager, completed a function report on Plaintiff's behalf on August 3, 2012. (R. 216.) Plaintiff explained that, among other things, she could pay bills; care for her personal needs; prepare simple meals that do not require significant preparation, for example a sandwich; feed her pets; and shop for food and toiletries weekly or every other week. (R. 217–21.) Plaintiff regularly spoke with her family members and did not have problems getting along with others, but she did not handle stress or change well and was easily overwhelmed. (R. 220–22.)

M.D., conducted the Phase II examination. (R. 314–17.) Dr. Barash's impressions were that Plaintiff suffered from generalized anxiety disorder, major depressive disorder, panic phobia and OCD features and lumbar radiculopathy migraine. (R. 312, 316.) Dr. Barash noted that Plaintiff had travel limitations, reduced sustained concentration and reduced tolerance for stress. (R. 312, 316.) Dr. Barash indicated that Plaintiff suffered from mild impairments in her ability to follow work rules, relate to co-workers, deal with the public and accept supervision. (R. 315–16.) Her ability to adapt to change was normal. (R. 315.) Dr. Barash concluded that Plaintiff required "better stabilization for employment" and that she was temporarily disabled for three months. (R. 311, 316.)

### 2. Dr. Eric Peselow

Plaintiff began seeing psychiatrist Dr. Peselow on June 6, 2011, and participated in weekly psychotherapy and medication management sessions until at least September 21, 2011.[12] (R. 380.) Regina Kcarney, LMSW conducted Plaintiff's initial evaluation in Dr. Peselow's office. (R. 375–76.) Kcarney's evaluation noted that Plaintiff's "pain management doctor has mismanaged her pain medication regime, resulting in the prescription of high doses of [P]ercoset and resulting addiction." (R. 375.) Plaintiff scored thirty-one on Becks' Depression Inventory, indicating severe depression. (R. 375.) After the initial meeting on June 21, 2011, Dr. Peselow evaluated Plaintiff on a weekly basis from July through August of 2011, and then on a monthly basis from September of 2011 through March of 2012.[13] (R. 373, 376–77.) Dr. Peselow

---

[12] Plaintiff asserts that Dr. Peselow did not begin treating Plaintiff until June 21, 2011, (Pl. Mem. 4), however, Dr. Peselow indicated that he has been treating Plaintiff since June 6, 2011, (R. 380).

[13] The record also contains notes from several weekly sessions with Kcarney between September 6, 2011 and November 18, 2011. (R. 20, 410–12.)

diagnosed Plaintiff with major depressive disorder and OCD. (R. 380.) On September 21, 2011, Dr. Peselow wrote a letter on Plaintiff's behalf indicating that "[d]ue to the severity of her symptoms [Plaintiff] is unable to work." (R. 380.)

On March 10, 2012, Dr. Peselow completed a Treating Physician's Wellness Plan Report for Plaintiff. (R. 378–79.) Dr. Peselow diagnosed Plaintiff with generalized anxiety disorder, major depressive disorder, panic phobia and OCD features. (R. 378.) Dr. Peselow reached his diagnosis based on his observations of "depressive symptoms, decreased self-esteem, lethargy, decreased motivation, poor concentration, inability to relate to others and anxiety that is affected by feelings of tension, irritability and fatigue." (R. 378.) Dr. Peselow concluded that Plaintiff's continued "symptoms of anxiety and depression make it impossible for her to work" and indicated that she could not work for at least twelve months. (R. 379.) Plaintiff also met with Dr. Peselow on July 23, 2012, at which time Dr. Peselow noted that Plaintiff was "upset over [a] life situation . . . OCD [ ] still prominent." (R. 372.) Plaintiff was prescribed Luvox, Xanax, Seroquel, Zoloft and Ambien over the course of her treatment with Dr. Peselow. (R. 372–73, 378.)

### 3. Dr. Salvatore Prainito

Salvatore Prainito, M.D., conducted two separate physical exams of Plaintiff, the first on January 10, 2014, and the second on February 10, 2014. (R. 496–507.) On both occasions, Dr. Prainito indicated that Plaintiff was alert and oriented to person, place and time; exhibited "normal mood and affect;" presented as well-groomed and established good eye contact. (R. 498, 504.) In the January 10, 2014 report, Dr. Prainito indicated that Plaintiff complained of depression and diagnosed Plaintiff with major depression and anxiety. (R. 496–501.) Prainito noted the following "problems": lumbar radiculopathy and "active" anxiety, depression and

OCD. (R. 496–501.) In the February 10, 2014 report, Dr. Prainito indicated that Plaintiff "denied depression" but nevertheless listed "major depress[ion]" as one of Plaintiff's "problems" along with lumbar radiculopathy, "active" anxiety, depression status and OCD. (R. 502–07.)

### 4. Dr. Stephen Kulick

Upon Dr. Prainito's referral, Plaintiff saw Stephen A. Kulick, M.D., a neurologist, on January 29, 2014, for further assessment of her migraine headaches, which she reported she experienced five times per month. (R. 549, 551.) Dr. Kulick performed a mental status examination and concluded that Plaintiff "was oriented in time, place, person and space," exhibited normal "immediate, recent, and remote memory," and that her repetition, spelling, calculations and other similar functions were normal. (R. 551–52.) Dr. Kulick's impressions were that Plaintiff suffered from "[u]ncontrolled hypertension" that should be addressed by her primary care physician. (R. 552.) Dr. Kulick directed Plaintiff to reduce her use of Sumatriptan to no more than three times a week and prescribed her a daily dose of Inderal "to reduce the number of migraine headaches."[14] (R. 552.) Dr. Kulick indicated he would follow up with Plaintiff and wanted her to have an MRI of the brain "to rule out an AV malformation." (R. 552.)

### iii. Evidence submitted to the Appeals Council

Plaintiff submitted multiple pieces of evidence to the Appeals Council that were not before the ALJ; the Appeals Council only accepted certain evaluation records from Dr. Weiner and included them as an exhibit to the record.[15] (R. 2, 5.)

---

[14] On February 10, 2014, Dr. Prainito noted that Dr. Kulick had prescribed Propranolol, the generic equivalent of Inderal, but Plaintiff had not started the prescription. (R. 502.)

[15] Plaintiff does not challenge the Appeals Council's rejection of some of her additional evidence. Accordingly, the Court declines to consider the rejected evidence.

On March 6, 2014, Plaintiff told Dr. Weiner that exercise caused her "severe discomfort." (R. 561.) Between April and May of 2014, Plaintiff reported severe back pain radiating down her left leg and indicated difficulty performing daily living activities. (R. 559–60.) On June 5, 2014, Plaintiff reported difficulty ambulating due to her back pain and explained that her left leg was "giving out." (R. 558.) Dr. Weiner discussed injections but Plaintiff wanted to avoid them, even though she was insured at the time. (R. 558.) On July 1, 2014, Plaintiff reported difficulty completing daily activities without her medication — she could not sit or stand for prolonged periods of time, had difficulty going up and down stairs and struggled carrying anything greater than five-to-ten pounds. (R. 557.) Dr. Weiner recommended that Plaintiff continue with a home exercise program.[16] (R. 557.)

### d. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the SSA.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since December 1, 2006, the date which Plaintiff identified as the onset date. (R. 16.) At step two, the ALJ found that Plaintiff had the following severe impairments: lumbar spine disc herniation, depression and anxiety. (R. 16.) The ALJ did not consider Plaintiff's pain in her left knee or migraines as severe impairments because the MRI of her left knee "showed only mild

---

[16] Plaintiff also submitted a report from an August 12, 2014 visit with Dr. Weiner, which the Appeals Council included as part of the record. The evaluation, however, relates to a time after the relevant disability period, which ended on the date of the ALJ's decision on June 16, 2014, (R. 2, 23, 79), and is not new, material evidence that relates to Plaintiff's condition during the relevant disability period. *See Woodford v. Apfel*, 93 F. Supp. 2d 521, 526–27 (S.D.N.Y. 2000) (noting that the standard for reviewing new evidence is set forth in 20 C.F.R. § 404.970(b) and requires consideration of new evidence if it is non-cumulative material evidence regarding a plaintiff's condition prior to the ALJ decision). Therefore, the Court does not consider the August 12, 2014 report in its analysis.

findings" and Dr. Kulick indicated that her migraines were relieved by medication. (R. 17.) At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet, or are equal to, the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 17.) At step four, the ALJ found that Plaintiff has the RFC to perform "sedentary work . . . except that she is limited to simple and routine tasks." (R. 18.)

In assessing the opinion evidence, the ALJ assigned "little weight" to the opinion of Dr. Weiner, Plaintiff's treating physician, because MRIs of Plaintiff's lumbar spine and knee show only "minimal" findings and "there are no cervical spine MRIs or EMGs to document any radiculopathy." (R. 21.) The ALJ also found that Dr. Weiner "mismanaged [Plaintiff's] medications, which has resulted in an addiction to Percocet, and his opinion is not very trustworthy." (R. 21.) The ALJ also assigned "little weight" to the opinion of Dr. Peselow because "he only treated the claimant for a short period" and the psychiatric examinations by Drs. Kulick and Prainito "were largely normal." (R. 21.)

After reviewing the medical evidence and Plaintiff's testimony, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 19.) The ALJ noted that Plaintiff does not indicate that she had any difficulty interacting with customers or managers when she attempted to waitress, is comfortable sitting, completed "a lot of lifting and carrying when she was caring for her brother," can lift ten pounds and is "able to perform household chores." (R. 21.) The ALJ also observed that Plaintiff denied her addiction to Percocet "but the record

indicates otherwise," and noted that Plaintiff discontinued psychiatric treatment because she had no insurance but continued treatment with Dr. Weiner throughout the entire period.  (R. 21.)

The ALJ determined that Plaintiff could complete sedentary work because the objective medical evidence "demonstrates only minimal findings on the lumbar spine MRI and left knee MRI," and Plaintiff "can sit and lift [ten] pounds, and is able to clean."  (R. 21.)  The ALJ also determined that Plaintiff's "psychiatric issues do not appear to be severely limiting, in that she is able to perform some activities of daily living and can interact with other people" and "no mental status examinations [] demonstrate limitations in concentration or memory."  (R. 21.)

Finally, the ALJ determined that Plaintiff was not capable of performing her past relevant work as a direct care worker, but concluded that based on Plaintiff's age, education, work experience, RFC and the vocational expert's findings "there are jobs that exist in significant numbers in the national economy" that Plaintiff can perform including work as a clerical worker, account clerk or order clerk.  (R. 21–23.)  Accordingly, the ALJ determined that since August 3, 2012, Plaintiff had not been suffering from a "disability" as this term is defined under the SSA. (R. 23.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*,

805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971));

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, a court

"can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*

*v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks

omitted). In deciding whether substantial evidence exists, courts "defer to the Commissioner's

resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir.

2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational

interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual

findings "must be given conclusive effect so long as they are supported by substantial evidence."

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If,

however, the Commissioner's decision is not supported by substantial evidence or is based on

legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d

27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making

such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute

which must be 'liberally applied'; its intent is inclusion rather than exclusion.'" *McCall v.*

*Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in

original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Supplemental security income benefits are available to individuals who are "disabled"

within the meaning of the SSA.[17] Federal disability insurance benefits are also available to

---

[17] Supplemental security income is available to individuals who are sixty-five years of age or older, blind or disabled and meet certain income requirements. 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202. The only issue before the Court is whether Plaintiff is disabled.

individuals who are "disabled" within the meaning of the SSA. To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*,

758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the ALJ erred by (1) improperly weighing the evidence, (2) improperly assessing Plaintiff's RFC and (3) improperly assessing Plaintiff's credibility. (Pl. Mem. 8, 14.) The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ (1) properly weighed the evidence, (2) properly determined Plaintiff's RFC based on objective medical evidence and medical opinions and (3) properly assessed Plaintiff's credibility in accordance with the necessary factors. (Comm'r Mem. 18, 23–24.)

### i. The ALJ improperly weighed the evidence

Plaintiff argues that the ALJ violated the treating physician rule by assigning "little weight" to the opinions of treating physicians Dr. Weiner and Dr. Peselow and failing to assign any weight to treating neurologist Dr. Kulick's opinions. (Pl. Mem. 9–12.) The Commissioner argues the ALJ properly weighed Dr. Weiner's opinion because his opinion "lacked objective support" and he was not trustworthy after he "mismanaged" Plaintiff's medication. (Comm'r Mem. 20–21.) The Commissioner also argues that the ALJ properly weighed Dr. Peselow's opinion because he only treated Plaintiff for "a short period" and the "evidence is inconsistent with [Dr. Peselow's] opinion." (Comm'r Mem. 21–22.) Lastly, the Commissioner argues that Dr. Kulick did not offer opinion testimony, his opinion is not entitled to controlling weight because he is not a treating physician and the ALJ adequately considered his single report. (Comm'r Mem. 19–20.)

### 1. Treating-physician rule – Dr. Weiner and Dr. Peselow

At the time of the ALJ hearing, Dr. Weiner had treated Plaintiff for ten years and diagnosed Plaintiff with cervical and lumbar radiculopathy. (R. 491, 554.) Dr. Weiner also provided an RFC assessment in which he opined that Plaintiff could sit or stand for only two hours during an eight-hour workday; would need to elevate her right leg while sitting; could lift up to ten pounds; and would be absent from work more than three times a month. (R. 554–55.) Dr. Weiner also indicated in his treatment notes that Plaintiff was totally disabled and unable to work. (R. 461, 466.) Dr. Peselow treated Plaintiff for approximately one year and diagnosed Plaintiff with generalized anxiety disorder, major depressive disorder, panic phobia and OCD feature. (R. 372, 378, 380.) Dr. Peselow concluded that Plaintiff's continued "symptoms of anxiety and depression ma[d]e it impossible for her to work" for at least twelve months and indicated that the findings were based on clinical findings of decreased self-esteem, lethargy, decreased motivation, poor concentration, inability to relate to others, feelings of tension, irritability and fatigue. (R. 378–79.) The ALJ assigned each of their opinions "little weight." (R. 21.)

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the plaintiff's] case record."[18] 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good

---

[18] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502).

reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."
*Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

Here, the ALJ did not err in failing to afford controlling weight to Dr. Weiner's and Dr. Peselow's opinions that Plaintiff was unable to work. *See Taylor v. Barnhart*, 83 F. App'x 347, 349 (2d Cir. 2003) (noting that a treating physician's opinion that the claimant "was 'temporarily totally disabled' [wa]s not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner" (first citing 20 C.F.R. § 404.1527(e)(1), and then citing *Snell*, 177 F.3d at 133)). Nevertheless, although "[r]eserving the ultimate issue of disability to the Commissioner relieves the Social Security Administration of having to credit a doctor's finding of disability," this does not "exempt administrative decisionmakers from their obligation, under [the treating physician rule], to explain why a treating physician's opinions are not being credited." *Snell*, 177 F.3d at 134; *Austin v. Colvin*, No. 14-CV-861, 2016 WL 335255, at *5 (W.D.N.Y. Jan. 28, 2016). Accordingly, although the ALJ properly discounted Dr. Weiner's and Dr. Peselow's opinions that Plaintiff was unable to work, the ALJ was still required to explain his reasoning for giving reduced weight to Dr. Weiner's and Dr. Peselow's diagnoses and physical and mental assessments. *Bolden*, 556 F. Supp. 2d at 166 ("Although the ALJ was entitled to discount the doctors' conclusory assertions of disability, the diagnoses that led to those assertions cannot similarly be ignored."). The Court considers the ALJ's weighing of the remaining opinions of Dr. Weiner and Dr. Peselow below.

### A. Dr. Weiner

The ALJ improperly applied the treating physician rule to Dr. Weiner's opinion by

"substitut[ing] [his] own expertise or view of the medical proof for the treating physician's opinion." *See Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) (citing *Burgess*, 537 F.3d at 131). The ALJ determined that the absence of any MRI or EMG evidence showing radiculopathy and the MRI evidence showing "single disc herniation that only minimally deforms the left ventral thecal sac," (R. 21), undermined Dr. Weiner's diagnosis of lumbar and cervical radiculopathy and his RFC assessment.[19] This was error, as the ALJ cannot substitute his own lay opinion for the uncontradicted testimony of a treating physician.[20] *See Meadors v. Astrue*, 370 F. App'x 179, 182–83 (2d Cir. 2010) ("The ALJ also relied on the fact that an MRI of [the plaintiff's] lumbar spine showed only 'mild degenerative changes,' and 'no evidence of disc herniation or nerve root entrapment'" to discredit the treating physician's diagnosis of radiculopathy. "But the ALJ was not at liberty to substitute his own lay interpretation of that diagnostic test for the uncontradicted testimony of [the treating physician], who is more qualified and better suited to opine as to the test's medical significance."); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("Indeed, as a "lay person[ ]," the ALJ simply was not in a position to

---

[19] The ALJ also noted that Plaintiff's left knee MRI "revealed only minimal findings." (R. 21.) The ALJ determined that Plaintiff's left knee pain was not a severe impairment, (R. 17), but nevertheless appropriately considered Plaintiff's knee impairment in determining Plaintiff's RFC assessment. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) ("A RFC determination must account for limitations imposed by both severe and nonsevere impairments." (citing 20 C.F. R. § 404.1545(a)(2) and then citing 20 C.F.R. § 416.945(a)(2)).

[20] The ALJ also determined that Dr. Weiner was "not very trustworthy" because Kcarney noted in her evaluation for Dr. Peselow that Dr. Weiner "mismanaged" Plaintiff's Percocet prescription. (R. 21.) However, on at least three occasions — each subsequent to Plaintiff's initial visit with Dr. Peselow — twice in 2012 and once in 2013, Dr. Weiner warned Plaintiff that it "is illegal to divert medications being prescribed and to doctor shop," (R. 426–27), which indicates he was sensitive to her potential misuse of a drug, rather than reckless as the ALJ implied. The ALJ ignored this evidence.

know whether the absence of muscle spasms would in fact preclude the disabling loss of motion described by [the treating physician] in his assessment."). Furthermore, Dr. Weiner only relied on MRI evidence in determining Plaintiff's L4-L5 central annular fissure/disc herniation; the remaining basis for the diagnosis — Plaintiff's limited range of motion in the cervical spine and tenderness to palpation along her cervical paraspinals with a 35/45 flexion and 30/45 extension, (R. 554) — are clinical findings independent of MRI evidence.[21]  *See, e.g.*, *Romanelli v. Astrue*, No. 11-CV-4908, 2013 WL 1232341, at *8 (E.D.N.Y. Mar. 26, 2013) (finding the ALJ's interpretation that an MRI "showed no abnormalities" did not undermine the treating physician's finding of the plaintiff's impairments which findings were based on different tests such that it was error not to assign controlling weight to the treating physician's opinion).

The ALJ also erred by ignoring medical evidence supporting Dr. Weiner's opinion. Dr. Barash's and Dr. Prainito's medical records noted lumbar radiculopathy as an impression and "problem," respectively. (R. 316, 500, 506.) The ALJ did not weigh this consistent evidence supporting Dr. Weiner's opinion.[22]  *See Kane v. Astrue*, 942 F. Supp. 2d 301, 312 (E.D.N.Y.

---

[21]  Dr. Weiner's treatment notes indicate "tenderness to palapation along cervical paraspinals," tenderness along Plaintiff's back and reduced flexion and extension flexibility in January of 2014, prior to Dr. Weiner's completion of Plaintiff's Summary Impairment Questionnaire, and Dr. Weiner also indicated Plaintiff's limited range of motion in areas surrounding Plaintiff's lumbar on several occasions. (R. 413, 426, 428, 442, 444, 448, 451.) In addition, during two visits prior to the alleged disability onset date, in March and July of 2006, Dr. Weiner noted that Plaintiff might be suffering from radiculopathy and indicated it should be ruled out, but no record shows that it was conclusively ruled out. (R. 470, 475); *cf. Monroe v. Comm'r of Soc. Sec.*, --- F. App'x ---, ---, 2017 WL 213363, at *1 (2d Cir. Jan. 18, 2017) ("The ALJ did not impermissibly substitute [her] own expertise or view of the medical proof for the treating physician's opinion. Rather, the ALJ rejected [the treating physician's] opinion because she found it was contrary to his own treatment notes.") (internal quotation marks and citation omitted).

[22]  The ALJ did not discuss or consider any findings or opinions from the FEGS report by Dr. Barash or Dr. Han. This is an independent error requiring remand. *See Estela-Rivera v.*

2013) ("The ALJ thus entirely ignored substantial evidence in the record supporting [the treating physician's] opinion which, if properly considered, would have supported application of the treating physician rule and a finding that [the] [p]laintiff is disabled. While the ultimate determination of disability rests within the discretion of the ALJ, the ALJ's failure to consider this relevant evidence was plain error."); *see Johnston v. Colvin*, No. 13-CV-00073, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) ("In reasoning that [the treating physician's] opinion merited 'little weight,' the ALJ recounted only those aspects of the opinion that were inconsistent with the weight of the objective medical evidence . . . [but] neglected to acknowledge objective medical evidence in the record that did support [the treating physician's] opinion. Failing to do so necessarily means that the ALJ's analysis of how much weight to ascribe to [the treating physician's] opinion was lacking.") (adopting report and recommendation).

---

*Colvin*, No. 13-CV-5060, 2015 WL 5008250, at *13 (E.D.N.Y. Aug. 20, 2015) ("'Regardless of its source,' Social Security regulations require that 'every medical opinion' in the administrative record be evaluated when determining whether a claimant is disabled under the Act." (quoting 20 C.F.R. ¶¶ 404.1527(d), 416.927(d))); *see also Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704, 2015 WL 321832, at *5 (S.D.N.Y. Jan. 23, 2015) (remanding because the ALJ failed to mention the opinion of a physician who examined Plaintiff and completed part of the FEGS evaluation form). This error is not harmless. "Failure to address evidence is harmless error if consideration of the evidence would not have changed the ALJ's ultimate conclusion." *McKinstry v. Astrue*, No. 10-CV-319, 2012 WL 619112, at *4 (D. Vt. Feb. 23, 2012); *cf. Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("Where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration." (internal quotations marks and alterations omitted)). Here, the failure to consider Dr. Han's and Dr. Barash's reports, which lend support to the reports of the treating physicians, was not harmless since the ALJ concluded that the treating physicians' opinions were not supported by the medical evidence. Dr. Han concluded that Plaintiff had "minimal difficulty" standing and walking due to pain in her left lower back that ranged from between three and ten on a ten point scale, (R. 307), but as discussed below, his findings as to Plaintiff's mental impairments were consistent with Dr. Peselow's findings.

## B. Dr. Peselow

The ALJ erred in not considering the evidence in the record consistent with Dr. Peselow's diagnosis of generalized anxiety disorder, major depressive disorder, panic phobia and OCD features and observations that Plaintiff exhibited decreased self-esteem, lethargy, decreased motivation, poor concentration, inability to relate to others, and feelings of tension, irritability and fatigue. (R. 378–79.) Instead, the ALJ selectively focused only on evidence he characterized as inconsistent. *See Meadors*, 370 F. App'x at 183; *Johnston*, 2014 WL 1304715, at *3.

Although the ALJ cited Dr. Kulick's and Dr. Prainito's "largely normal" psychiatric examinations as evidence contradicting Dr. Peselow's medical opinion, he ignored consistent evidence supporting Dr. Peselow's opinion. The ALJ failed to weigh Dr. Prainito's diagnosis that Plaintiff had major depression and anxiety[23] and Dr. Prainito's determination that Plaintiff had problems with major depression, and "active" anxiety, depression and OCD. (R. 500, 506.) Plaintiff correctly argues that the ALJ failed to consider that Dr. Peselow's clinical findings of decreased self-esteem, lethargy, decreased motivation, poor concentration, inability to relate to others, feelings of tension, irritability and fatigue, (R. 378–79), were consistent with the findings of non-treating physician Dr. Barash of "restlessness, a depressed mood and slowed backwards simple count." (Pl. Mem. 11 (citing R. 315).) Dr. Peselow's diagnosis was also consistent with examining physician Dr. Barash's impressions of generalized anxiety disorder, major depressive disorder and panic phobia and OCD features as well as examining physician Dr. Han's

---

[23] The ALJ mentioned this finding in his decision, (R. 21 (citing Exhibit 10F)), but did not consider it when weighing Dr. Peselow's opinion; instead, asserting to the contrary that Dr. Prainito's findings undermined Dr. Peselow's because Dr. Prainito's findings were "largely normal." (R. 21.)

observations that Plaintiff was anxious and exhibited poor attention during his examination. (R. 307, 316.) However, the ALJ failed to mention certain of this evidence and did not appear to weigh any of this evidence against Dr. Peselow's opinion. *Larsen v. Astrue*, No. 12-CV-00414, 2013 WL 3759781, at *2 (E.D.N.Y. July 15, 2013) ("[A]lthough the ALJ did mention evidence in the record that corroborated aspects of [the treating physician's] findings and ultimate conclusions, . . . the ALJ did not elaborate on how this evidence affected the weight accorded to [the treating physician's] opinions.").

In addition, the ALJ's reliance on Dr. Peselow's "short period" of treatment and Plaintiff's discontinuation of psychiatric treatment and medication were not "good reasons" to discredit Dr. Peselow's opinion. *See Roman v. Astrue*, No. 10-CV-3085, 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health."); *see also Sanders*, 506 F. App'x at 77 (Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."). In light of the evidence corroborating Dr. Peselow's opinion, the opinions of non-psychiatrists Dr. Prainito and Dr. Kulick should not have been assigned more weight than Dr. Peselow's given the limited nature of their relationship with Plaintiff. Dr. Peselow treated Plaintiff for over one year, from June 6, 2011 through July 23, 2012, at first on a weekly and then on a monthly basis. (R. 372, 380.) By comparison, Dr. Prainito only completed two examinations of Plaintiff, the first of which was on January 10, 2014, (R. 499), and Dr. Kulick only examined Plaintiff on one occasion during the relevant period, (R. 551–52) — none of which establish the same treating

relationship as psychiatrist Dr. Peselow.[24]  *See Mateo v. Colvin*, No. 14-CV-6109, 2016

WL1255724, at *15 (E.D.N.Y. Mar. 28, 2016) (finding error where ALJ gave "considerable

weight" to a consultative examiner and relied on the consultative examiner's opinion as

"objective evidence" to discredit the plaintiff's treating psychiatrist's opinion and ignored

evidence corroborating the treating psychiatrist's opinion); *Corporan v. Comm'r of Soc. Sec.*,

No. 12-CV-6704, 2015 WL 321832, at *28 (S.D.N.Y. Jan. 23, 2015) ("[i]n the case of mental

disabilities, [t]he results of a single examination may not adequately describe [the claimant's]

sustained ability to function" and thus it is "vital" to "review all pertinent information relative to

[the claimant's] condition, especially at times of increased stress" (second, third and fourth

alterations in original) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E))).

Plaintiff's discontinuation of treatment with Dr. Peselow, while potentially probative of

Plaintiff's credibility, as discussed below, is adequately accounted for by weighing the duration

of Dr. Peselow's treating relationship to Plaintiff and does not contradict Dr. Peselow's medical

opinion.  The ALJ erred in exclusively focusing on the length of the treating relationship and

disregarding evidence supporting Dr. Peselow's opinion.

The ALJ's failure to apply the treating physician rule appropriately to Dr. Weiner's and

Dr. Peselow's opinions requires remand.[25]  *See Meadors*, 370 F. App'x at 183 (remanding where

---

[24]  Furthermore, the focus of Dr. Kulick's examination was to address Plaintiff's problem
with migraines, and Dr. Kulick did not evaluate Plaintiff's mental health other than to conduct
the mental status exam.  (R. 549 (noting the reason for Plaintiff's visit to Dr. Kulick as "chronic
migraines / headache's")); *see, e.g.*, *Romanelli v. Astrue*, No. 11-CV-4908, 2013 WL 1232341, at
*8 (E.D.N.Y. Mar. 26, 2013).

[25]  The ALJ's error in making his own medical findings and failing to consider consistent
medical evidence before discrediting the treating physicians' opinions was not harmless where
the only other sources of medical evidence were non-treating sources and lay testimony.  *See
Greek*, 802 F.3d at 376 (holding that improperly weighing treating physician's opinion was not

ALJ improperly discredited the treating physician's opinion and the objective medical evidence did not contradict the opinion). The Court therefore remands for the ALJ to apply the treating physician rule appropriately to Dr. Weiner's and Dr. Peselow's opinions.

## 2. Non-treating physician – Dr. Kulick[26]

Under the statute, a "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902.

Here, the ALJ did not err in failing to explicitly assign any weight to Dr. Kulick's findings. Dr. Kulick performed a mental status examination and concluded that Plaintiff "was oriented in time, place, person and space," exhibited normal "immediate, recent, and remote memory," and her repetition, spelling, calculations and other similar functions were normal. (R. 551–52.) In support of her argument that Dr. Kulick's opinion testimony was overlooked, Plaintiff incorrectly cites to opinion testimony by Dr. Weiner. (Pl. Mem. 9 ("The ALJ's error was not harmless as the vocational expert testified that an individual as limited as described by Dr. Kulick, (R. 455), would not be able to perform any full-time work[,] (R. 51).").) Dr. Kulick did not offer any opinion; he did not opine on Plaintiff's ability to work, his mental status examination showed unremarkable results, and he did not comment on the severity or symptoms

---

harmless error where the only evidence consistent with the treating physician's opinion was that of non-treating physicians and lay witnesses, which do not hold the same weight).

[26] The Commissioner correctly notes that a large portion of Plaintiff's opposition mistakenly refers to Dr. Kulick's medical opinions while citing the opinions of Dr. Weiner, (Comm'r Mem. 10 (citing R. 455, 554–55); Pl. Mem. 9–10). The Court disregards Plaintiff's arguments as to Dr. Kulick that reference evidence submitted by Dr. Weiner but nevertheless addresses whether the ALJ committed error in evaluating Dr. Kulick's medical evidence.

of Plaintiff's mental health or her mental restrictions.[27]  (R. 551–52.)

As the Commissioner argues, even if Dr. Kulick's findings were opinion evidence, his opinion is not entitled to "controlling weight" because he only examined Plaintiff once[28] prior to Plaintiff's ALJ hearing on January 29, 2014, (R. 549–52), and therefore he is not a treating physician.  *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (noting that a physician who examines a patient "once or twice" is not generally considered a treating source); *Dannettel v. Comm'r of Soc. Sec. Admin*, No. 12-CV-1890, 2014 WL 4854980, at *7 (N.D.N.Y. Sept. 30, 2014) ("[A]t the time of the hearing, [the] [p]laintiff had only been examined by [the alleged treated physician] on one occasion, which under 20 C.F.R. § 404.1502 categorizes Dr. Misyulya as a nontreating source."); *see also Snell*, 177 F.3d at 133 (disregarding the plaintiff's argument that a certain physician's opinion should be given controlling weight where "no clear evidence" supported a treating relationship).  The ALJ properly considered Dr. Kulick's single report in his decision.  (R. 20.)

### ii.  The ALJ improperly determined Plaintiff's RFC

Plaintiff argues that, in light of the ALJ's improper weighing of the evidence, the ALJ did not rely on any "specific medical findings or other persuasive evidence" to support his RFC finding.  (Pl. Mem. 14.)  The Commissioner argues that the ALJ properly limited Plaintiff to sedentary work with simple and routine tasks in light of the objective evidence and medical

---

[27]  Opinion evidence "reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2).

[28]  Plaintiff asserts that Dr. Kulick had been treating her on a monthly basis since 2004 but cites to the Summary Impairment Questionnaire prepared by Dr. Weiner as the evidence of the longstanding relationship.  (Pl. Mem. 3.)

opinions included in the record.  (Comm'r Mem. 23.)

In determining a claimant's RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." *Stover v. Astrue*, No. 11-CV-172, 2012 WL 2377090, at *6 (S.D.N.Y. Mar. 16, 2012) (citing *Mongeur*, 722 F.2d at 1037); *see also Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective complaints of pain." (quoting 20 C.F.R. § 416.945(a)(3))).  An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 404.1545.  With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis.  *Id.* § 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work."  *Id.*  With respect to a claimant's mental abilities, an RFC determination indicates the "nature and extent" of a claimant's mental limitations and capacity for work activity on a regular and continuing basis. *Id.* § 404.1545(c).  For example, a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work."  *Id.*

### 1. Physical impairments

After discrediting the opinion of Plaintiff's treating pain management physician, the ALJ erred by determining Plaintiff could perform sedentary work based on her testimony and his own interpretation of the lumbar spine and left knee MRI findings. *See Balsamo*, 142 F.3d at 80–81 ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." (quoting *McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983))); *see Ostrom v. Comm'r of Soc. Sec.*, No. 14-CV-00268, 2015 WL 1735097, at *12–14 (N.D.N.Y.) (finding error where the ALJ rejected the "only competent [RFC] medical opinions of record" and instead "substituted her own judgment" of the medical findings as support for the RFC), *report and recommendation adopted*, 2015 WL 1735097 (Apr. 16, 2015).

Sedentary work requires sitting for approximately six hours in an eight-hour work day, occasional walking and standing for no more than two hours during a work day, and lifting up to ten pounds. *See* 20 C.F.R. § 404.1567; SSR 96–9p, 1996 WL 374185, at *3 (July 2, 1996). Dr. Weiner's report indicated that Plaintiff could fulfill the standing and lifting requirements for sedentary work but found that Plaintiff could only sit for two hours out of an eight-hour work day. (R. 555.) Dr. Weiner's treatment notes reflect that Plaintiff had difficulty sitting for long periods of time and had a limited range of motion along her spine. (R. 413, 418, 426, 428, 442, 444, 448, 451, 557.) No other physician provided an opinion as to Plaintiff's RFC capacity or her ability to sit for prolonged periods of time. The ALJ erred in determining Plaintiff's RFC based on his understanding of the MRI evidence and Plaintiff's testimony that "she can sit and lift [ten] pounds, and is able to clean" without relying on any supporting medical evidence.

(R. 21.) *See Henningsen v. Comm'r of Soc. Sec. Admin.*, 111 F. Supp. 3d 250, 271 (E.D.N.Y. 2015) ("In reaching this conclusion, despite the lack of any medical opinion in the record indicating that [the] plaintiff could sit for more than six (6) hours in a day, and contrary to the opinions of [the] plaintiff's treating physicians, the ALJ "ma[de] an RFC determination in the absence of supporting expert medical opinion . . . [and] improperly substituted [his] own lay opinion for the opinion of a physician." (quoting *Santillo v. Colvin*, No. 13-CV-8874, 2015 WL 1809101, at *9 (S.D.N.Y. Apr. 20, 2015)); *cf. Monroe* --- F. App'x ---, ---, 2017 WL 213363, at *318, 2017) (finding no error where the ALJ relied on the treating physician's treatment notes to determine the RFC after assigning the RFC assessment of the physician "little weight").

The ALJ could not rely on Plaintiff's testimony as to her daily activities as the primary basis, in the absence of medical evidence, that Plaintiff could sit for long periods of time. *See, e.g.*, *Murdaugh v. Sec. of Dep't of Health & Human Sers. of U.S.*, 837 F.2d 99, 102 (2d Cir. 1988) (finding misapplication of the treating physician rule and noting "that appellant receives conservative treatment, waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table can scarcely be said to controvert the medical evidence"). The ALJ noted that Plaintiff could drive if needed, attempted to work as a waitress for a period of less than one month, can perform household chores, and did a lot of lifting and carrying when caring for her older brother. (R. 21.) These daily activities do not establish that Plaintiff can sit for six hours during an eight-hour work day, and she should not be punished for continuing to perform daily activities in spite of her pain. *See, e.g.*, *Walsh v. Colvin*, No. 13-CV-0603, 2014 WL 4966142, at *8–9 (N.D.N.Y. Sept. 12, 2014) (remanding the ALJ's finding that the plaintiff could perform past sedentary position as a receptionist even though her daily activities included working two days per week as a home care provider, which required assisting her client in and

out of bed with a Hoyer lift, preparing meals, doing laundry and dishes and making the client's bed as well as completion of the plaintiff's daily exercise program, household chores and regular gardening because "none of these asserted daily activities demonstrate that [the] plaintiff has the ability to sit for the amount of time required by a sedentary position"), *report and recommendation adopted*, 2014 WL 4966142 (Sept. 30, 2014); *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) (finding that the ALJ "compounded his error" of not obtaining a medical opinion as to whether the plaintiff could sit for six hours when he relied on the plaintiff's testimony that she cooked and shopped for herself, used public transportation, and remained seated during one plane ride as evidence that she was capable of sedentary work).

### 2. Mental impairments

The ALJ erred by determining that Plaintiff was limited to "simple and routine tasks" because Plaintiff's mental impairments did "not appear to be severely limiting," without weighing the findings of inconsistent opinion evidence against that conclusion. The ALJ appeared to rely on Dr. Prainito's and Dr. Kulick's mental status examinations and Plaintiff's testimony for his RFC assessment that "no mental status examinations . . . demonstrate limitations in concentration or memory" and Plaintiff "is able to perform some activities of daily living and can interact with other people." (R. 21.) However, the ALJ failed to weigh the results of the mental status examinations against the findings of Dr. Peselow, which the ALJ accorded "little weight," and Dr. Barash and Dr. Han, which opinions the ALJ did not consider, regarding Plaintiff's limited concentration. Treating psychiatrist Dr. Peselow found that Plaintiff suffered from poor concentration, (R. 378); examining physician Dr. Barash, who also conducted a mental status examination with normal results, (R. 315), found that Plaintiff had reduced sustained concentration and tolerance for stress and "did simple counting backwards bit slow,"

(R. 316); and examining physician Dr. Han found Plaintiff was anxious and exhibited poor attention during his exam, (R. 307). The ALJ failed to consider these findings, in reaching his RFC assessment. *See, e.g.*, *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361–62 (N.D.N.Y. 2016) (finding the ALJ's RFC assessment was not supported by substantial evidence where the ALJ disregarded findings by a consultative examiner showing limitations in attention and concentration that were supported by diagnostic tests and instead relied on a state agency medical non-examining medical consultant who determined Plaintiff could perform simple work); *cf. Priel v. Astrue*, 453 F. App'x 84, 86–87 (2d Cir. 2011) (holding the ALJ determined the appropriate RFC where five doctors offered opinions contradicting the treating psychiatrist's opinion and the treating psychiatrist's own records supported the ALJ's RFC determination).

Furthermore, the ALJ accounted for a limitation in Plaintiff's mental capacities relying solely on his determination that Plaintiff could complete daily activities and interact with others[29] but did not indicate which, if any, of the medical opinions or medical evidence he found supportive of his conclusion that Plaintiff was limited to "simple and routine" tasks, thereby frustrating judicial review. *See, e.g.*, *Babcock v. Barnhart*, 412 F. Supp. 2d 274, 281–83 (W.D.N.Y. 2006) ("[T]he ALJ did not explain whether or how he considered certain medical source opinions in the record concerning the extent and severity of plaintiff's nonexertional limitations, and their effect on his ability to perform the full range of sedentary work."); *see also Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2003) ("Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate

---

[29] The non-medical section of Plaintiff's FEGS report indicated that Plaintiff interacted appropriately with others. (R. 299.)

meaningful review.").  This is not harmless error because with proper application of the treating physician rule, consideration of the treating psychiatrists' treatment notes and consideration of all the medical evidence in the record, the ALJ might have found Plaintiff even further limited in her mental impairments which was not accounted for in the vocational expert's hypotheticals. *Monroe*, --- F. App'x at ---, 2017 WL 213363, at *3 ("[S]uch error was harmless, since [the plaintiff] has not identified any prejudice and the record establishes that the error did not affect the ALJ's decision."); *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) (finding harmless error in failing to accord a treating psychiatrist's opinion controlling weight where the ALJ included the treating psychiatrist's opinions in reaching the RFC determination).

Accordingly, after proper application of the treating physician rule, on remand the ALJ should reassess Plaintiff's RFC in light of the medical evidence in the record and explain the reasons that support his RFC assessment.

### iii.  The ALJ's assessment of Plaintiff's credibility

Plaintiff argues that the ALJ improperly relied on Plaintiff's daily activities, alleged addiction to Percocet and discontinuation of psychiatry treatment to discredit her testimony. (Pl. Mem. 16.)  The Commissioner argues that the ALJ properly considered each of the credibility factors in determining Plaintiff's credibility.  (Comm'r Mem. 24–26.)  Because the Court remands the case for further consideration of the medical evidence, and the ALJ concluded that "it does not appear that [Plaintiff's] complaints of severe pain are objectively supported by the medical evidence or by her actions," the Court will not address whether the ALJ properly evaluated Plaintiff's credibility, as the ALJ's errors impact the Court's ability to review the

credibility determinations.[30]  *See Daniel v. Astrue*, No. 10-CV-5397, 2012 WL 3537019, at *11 (E.D.N.Y. Aug. 14, 2012) ("The ALJ's determination that [the plaintiff's] allegations were inconsistent with the medical evidence was tainted by the ALJ's failure to properly evaluate the opinions of [the plaintiff's] treating physicians — a failure that would naturally have affected how the ALJ viewed the totality of the medical evidence.  On remand, the ALJ is directed to consider [the plaintiff's] subjective complaints in light of the ALJ's fresh evaluation of [the physicians'] opinions." (citing *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004))); *Torres v. Comm'r of Soc. Sec.*, No. 13-CV-330, 2014 WL 69869, at *14 (E.D.N.Y. Jan. 9, 2014) (declining to reach the issue of credibility and instead directing the ALJ to "examine plaintiff's subjective complaints 'in light of the ALJ's fresh evaluation' of [the treating physician's] opinion concerning plaintiff's ability to work").

---

[30]  On remand, the ALJ should not discredit Plaintiff's testimony because she failed to seek psychiatric treatment while she was uninsured.  It is improper to fault a claimant for failing to seek medical treatment without considering the reasons the Plaintiff failed to pursue treatment. *See Snyder v. Colvin*, --- F. App'x ---, ---, 2016 WL 3570107, at *2 (2d Cir. June 30, 2016) ("Although an ALJ may find a plaintiff less credible if she failed to seek medical treatment, an ALJ is obligated to consider any explanation a plaintiff may have for such failure, *see* SSR 16–3p, 81 Fed. Reg. 14,166, 14, 170–71 (Mar. 16, 2016).").  Failure to seek medical treatment because a claimant is uninsured and cannot afford such treatment is not a basis to discredit the Plaintiff's testimony as to her symptoms.  *See Burger v. Astrue*, 282 F. App'x 883, 884 (2d Cir. 2008) (finding failure to pay because claimant was "uninsured and could not pay for regular medical care" an inadequate ground to discredit Plaintiff's credibility and determining the ALJ should have required a consultative examination to complete the record); *Williams v. Colvin*, No. 14-CV-5875, 2015 WL 5774875, at *4 (E.D.N.Y. Sept. 30, 2015) (finding error where the ALJ relied on a period of lapse in treatment without further inquiring into the reasons for the lack of treatment which included lack of insurance and the claimant's refusal to take pain medication because of a former addiction).  The record shows that while Plaintiff was uninsured in 2013, she forewent an epidural injection recommended by Dr. Weiner and was not able to afford psychiatric medication, which supports her explanation regarding why she stopped seeking psychiatric treatment.  (R. 418–20.)

**III. Conclusion**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: March 23, 2017
       Brooklyn, New York